Lawrence B. THOMAS, Appellee and Cross-Appellant,

v.

E. J. KORVETTE, INC., Appellant and Cross-Appellee.

Nos. 71–2061, 71–2062.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1973.

Decided March 26, 1973.

As Amended May 3, 1973.

F. Hastings Griffin, Jr., Philadelphia, Pa., for E. J. Korvette, Inc.

James E. Beasley, Philadelphia, Pa., for Lawrence B. Thomas.

Before McLAUGHLIN, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

This appeal is based on the entry of judgment in plaintiff Lawrence Thomas' favor in accord with F.R.Civ.P. 59, as explained in 6A Moore's Fed.Prac. 59.15 [1]. The sum of $150,000 was awarded to Thomas on his malicious prosecution suit against E. J. Korvette. Motions for a new trial and judgment n. o. v. were denied by the trial court, D.C., 329 F. Supp. 1163. Also involved is a cross-appeal by plaintiff-appellee on the amount of damages. The jury awarded $750,000 to plaintiff Thomas, but this amount was remitted by the trial judge from $750,000 to $150,000.

The action was brought against Korvette's by Thomas, who was the security

head at Korvette's King of Prussia, Pa. store at the time of the incident in question. On November 12, 1965 Thomas was seen by another store employee coming down an escalator to the ground floor with a package under his arm. He was observed looking around a bit at the bottom of the escalator and again glancing about while directly in front of an outside door of the store. This was approximately 11:30 A.M. Thomas left the store with the package. There was no evidence at this time that the package had been paid for. Thomas was then seen placing the package in the trunk of his automobile which was in the store parking lot. On the report of this by the observing employee to the store management, a security officer from one of Korvette's other stores was summoned to investigate. A Mr. Smith was the investigator called upon, who was experienced in the field. Smith confronted Thomas with questions concerning the alleged package in his car. Thomas claimed that he did have two games in his trunk with an attached register receipt, signifying his payment. Thomas opened his car trunk and an inspection produced no receipt or even any tape residue on the game package.[1] Thomas claimed that the questioning of a specific cashier and register tape would verify his story. Such did not turn out to be the case. Thomas refused to take a polygraph test at that time. He had previously undergone such a test, at the time of his appointment as security head, and was familiar with its usage and format.

On the basis of these facts, Smith determined that there was a bona fide case against Thomas and so he called for the police.[2] On the arrival of police (7:20 P.M.) Thomas claimed that he had purchased the two items in the toy department, carried them to his car through the front door, and placed them in the trunk of his auto. The police, considering the facts as presented and the story, felt that there was a sound cause of action (P. 678a) against Thomas. The complaint against Thomas was then signed by employee Brown who had witnessed Thomas' actions in leaving the store with the game. These were all of the facts concerning the incident which Brown had to predicate his filing of the complaint.

There was a hearing before a Justice of the Peace at which time many factual disputes became evident. Thomas here had a further explanation as to the events on the day in question. He alleged, in effect, that he had carried the first game out of the store while following a suspected shoplifter. He asserts that he placed it in his trunk for convenience and paid for it later in the afternoon when he paid for a second game which he had put in his trunk along with the first game. He produced, at this time, a receipt from the toy department

---

1. The store policy was to attach receipts to the packages by means of cellophane tape. Thus it was felt by Smith that had there been a piece of tape affixed at one time to the package or packages, there would at least have remained some evidence of tape residue, even if the receipt itself were now missing.

2. Act of June 24, 1939, P.L. 872 § 816.1, added July 5, 1957, P.L. 501 § 1, as amended 18 P.S. § 4816.1 subsection (b) provides in pertinent part:
 "(b) Any person wilfully concealing unpurchased goods or merchandise of any store * * * either on the premises or outside the premises of such store, shall be prima facie presumed to have so concealed such article with the intention of converting the same to his own use without paying the purchase price thereof within the meaning of subsection (a) of this section * * * Persons so concealing such goods may be detained, in a reasonable manner and for a reasonable length of time, by a peace officer or a merchant or a merchant's employee in order that recovery of such goods may be effected. Such detention by a peace officer, merchant or a merchant's employee shall not render such peace officer, merchant or merchant's employee, criminally or civilly liable for false arrest, false imprisonment or unlawful detention."

cash register from the date in question, but it did not correspond exactly to the price of the two games plus tax. He alleged some error by the check-out girl as the cause of this discrepancy.[3]

As a result of the conflict in factual accounts and the small sum of money involved, the Justice of the Peace decided to discharge the case putting costs of $11 on defendant Thomas.[4]

Thomas thereafter instituted this action for malicious prosecution against Korvette. The elements for a cause of action for malicious prosecution are stated in Res. Torts (1938) § 653. Summarizing, the Restatement says that if the proceedings were initiated (1) without probable cause, and (2) with the primary purpose other than that of bringing an offender to justice, a private person who initiated such proceedings might be held liable, in cases where a criminal proceeding had been instituted by defendant against plaintiff and where termination of the proceedings was in favor of the accused.

Although there are numerous grounds raised on appeal at this time the result in all malicious prosecution cases is primarily affected by whether or not there was probable cause for the filing of the complaint. Probable cause in malicious prosecution matters is defined in Miller v. Pa. R.R. Co., 371 Pa. 308, 314, 89 A.2d 809, 812 (1952) as "reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." See also, Neczypor v. Jacobs, 403 Pa. 303, 308, 169 A.2d 528, 530 (1961) which states, "By probable cause is not meant an actual state of guilt. One is justified in

launching a criminal prosecution if the facts convince him, as a reasonable, honest and intelligent human being, that the suspected person is guilty of a criminal offense. The arresting person may be in error, but if his error is an honest one, not motivated by personal malice, bias, or revenge, the law will hold him harmless, regardless of the eventual result of the criminal prosecution." The problem arises with regards to who should decide that question in this litigation. The trial court allowed the jury not only to make special factual determinations, but also to decide the ultimate question concerning the existence of probable cause. Korvette disputes this disposition by the trial judge declaring that this is a decision solely for the court.

 Korvette asks for a judgment n. o. v. but according to 5A Moore's Fed.Prac. 50.07 [2], such may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a "one-way" verdict proper, judgment n. o. v. should not be awarded. The court must view the evidence in the light most favorable to the party who secured the jury verdict. In light of the factual conflict, obvious from the different versions of the story told here, there is no foundation to order a judgment n. o. v. However, motions for a new trial are based on the court's discretion and "the appellate court will exercise its power to review the lower court's ruling and reverse when the lower court * * * failed to exercise its discretion; or where the trial court abused its discretion." 6A Moore's

---

3. Store policy was to total all sales singly on the register so that no mistake would be made in totals. However, it was admitted that some of the clerks did not absolutely follow this policy at all times and instead added the cost of more than one item in their heads.

4. The Justice of the Peace did not feel this case deserved serious attention saying "The amount of money involved isn't important enough to hold him." (for court) P. 717(a) " * * * I am not worried about the 11 bucks for a deal like this." P. 718(a)

Fed.Prac. 59.05 [5].[5] Our query therefore is to determine if there was prejudicial error by the trial court in this suit which adversely affected substantial rights of appellant as to dictate a new trial on the merits.

■ An examination of the Restatement of Torts and how it has been interpreted by pertinent Pennsylvania case law will help to decide this question. Restatement of Torts, § 673, Comment d, adopted by Pennsylvania in Miller v. Pa. R.R. Co. 371 Pa. 308, 89 A.2d 809 (1952) considering this type situation, states:

" * * * upon the issues of favorable termination and probable cause, the jury has only the function of finding the circumstances under which the defendant acted. The court determines whether, under those circumstances, the termination was sufficiently favorable to the accused, and whether the defendant had or had not probable cause. Where there is no conflict in the testimony as to what the circumstances were, the court has no need for finding of the jury. The jury is not called upon to act unless there is a conflict in the testimony which presents an issue of fact for its determination.

"The respective functions of the court and jury in determining the issue of probable cause, can be exercised by them in one of two ways. *The better but less usual method* is to require the jury to find a special verdict setting forth the circumstances under which they find that the proceedings were initiated. Upon these findings the court then determines whether the defendant had probable cause. *The usual method* is for the court to charge the jury under what combination or combinations of circumstances,

which may be found under the evidence, the defendant did or did not have probable cause for initiating the proceedings." (Emphasis supplied).

Each side here has mentioned Simpson v. Montgomery Ward, 354 Pa. 87, 46 A. 2d 674 (1946) which discussed the restatement and cited certain words which, they feel, support their respective positions on the point. Korvette urges that Simpson holds, in malicious prosecution suits, the question of probable cause for the criminal prosecution must be decided by the court. Thomas cites Simpson, supra, as standing for the proposition that where there is a conflict in testimony, the trial judge *must* submit the issue of probable cause to the jury. We think that each side is correct to an extent. This appeal provides a good discussion of the law in the area and illustrates the complicated function of determining probable cause in problems containing factual conflict. Res. 673, Comment d, provides two solutions to the type of issue before us; a "better" as well as the "usual" method. This appeal presents notice of the difficulty which a jury might have distinguishing probable cause from obvious guilt and innocence in certain areas. In that kind of dilemma, Simpson recognizes the necessity of judicial determination of probable cause. This is the situation in which Res. 673d dictates using the "better but less usual method" of determining probable cause, according to Simpson. That designated situation being where "jurors are likely to confuse the issue of the guilt or innocence of the defendant in the criminal case, out of which the civil action originated with the basic issue, whose determination decides the civil action. That basic issue is the want of probable cause for the criminal prosecution", Simpson, 354 Pa. at 92, 46 A.2d at 676. In the

---

5. The term abuse, when applied to a court's exercise of its discretion is peculiarly of legal significance, wholly unrelated to the meaning of the same term when used in common parlance. Action that would be necessary in ordinary affairs to make one guilty of an abuse, connotes conduct of a different grade than what is meant when a court is said to have abused its discretion. Abuse of discretion in law means that the court's action was in error as a matter of law. And when such abuse exists, reversal will be ordered.

instant matter, this specific situation (the high likelihood that the jury might confuse guilt or innocence with probable cause) did exist, and yet even so, the question was submitted to the jury. The problem can be seen plainly through the undisputed facts and circumstances in this appeal. The attorney for Thomas accentuated and compounded the difficulty by his summation when he told the jury "Did he steal those games? That is the only question because when you get the answer to that question, then all of the legal questions about probable cause, reasonable investigation, and all that, fall right into place * * *." (489a). Furthermore, the trial judge himself recognized the morass which this statement created for the jury when he remarked, at sidebar, as appellant notes in his brief, "Let me point out that your (plaintiff's counsel) entire argument to the jury was directed to the issue of guilt or innocence, virtually your entire argument." Those statements and the complicated nature and confusing tone of much of the evidence presented at trial, make it very clear that this was an excellent example of why a probable cause question is for the court to decide after the jury has answered appropriate special interrogatories,[6] even though there was conflict in the testimony. Some indication of the jury's confusion of the real question here might be evidenced by their inquiry on rendering a verdict, at which time they were extremely concerned with what would become of the police and arrest records of Thomas as a result of their actions. Submission of the question of probable cause to the jury was certainly not harmless error, since the jury, because of its finding of "no probable cause" came up with an enormous award in Thomas' favor. "An improper submission * * * of a material issue to the jury is another ground for a new trial." Moore's Fed. Prac. 59.08 [2].

There were additional factors present which also show the necessity of a new trial. Korvette has questioned the district court's actions in permitting plaintiff to introduce evidence on a 1969 slander claim.[7] Korvette asserts this to have been most damaging to its defense; that alleged slander was not pleaded or included in the pre-trial order and was barred by the statute of limitations. Some mention of that claim had been made at the pre-trial solely with respect to the damage item of loss of earning capacity. (p. 23a). It was determined admissible only to serve to "possibly shed light on any claim of malice in connection with the original transaction." (p. 31a). However, through the action of the trial court granting Thomas' motion to amend his complaint, it allowed an entirely new claim to be considered by the jury while it was passing upon the original contention of the plaintiff. The decision of whether or not to permit a change (in the pre-trial order) is within the discretion of the trial judge and "appellate interference with this discretion should be kept at a minimum." Ely v. Reading Co., 424 F.2d 758 (3 Cir. 1970). We wholeheartedly agree with and follow that conclusion in its proper place but, in this instance we have the kind of circumstance which

---

6. For the type of special questions, see those suggested by the Supreme Court of Pennsylvania in Simpson v. Montgomery Ward & Co., 354 Pa. 87, 46 A.2d 674 (1946).

7. This slander claim was based on an alleged 'phone call made in February 1969 by a Mr. Snyder of Miley Detective Agency, to Korvette's security department. Mr. Thomas had applied for a job with Miley at this time, and Snyder was supposedly calling Korvette's to check Thomas' background. Snyder testified that he was put directly on the line with a man identifying himself as the security manager. Snyder told this man that he intended to hire plaintiff for a position of trust. (236a). This man at Korvette's was then said to pause, check some records, and then tell Mr. Snyder that Thomas was a "thief," that he didn't know whether criminal charges were still pending, and that plaintiff "could not be trusted." (236a–37a).

produced manifest injustice by its late addition. There was much evidence offered on this separate slander issue, which was not done merely to show malice. In our case, a verdict had been reached on the slander alone and the assertion of damages had even been argued. Finally, after all this had been given in great detail to the jury, the trial judge stated that the 1969 slander charge, as such, was barred by the statute of limitations, and consideration of it should be limited to the assertion of malice. We are satisfied that the insertion of the slander attack was not merely harmless error or "favorable to defendant." It is impossible to guarantee that a jury of laymen would be able to cast the testimony concerning slander completely aside, in reaching its decision on damages. Thomas' lawyer made deliberate reference to it, when discussing the question of punitive damages. From the sum which the jury awarded plaintiff, ($750,000) it is crystal clear that the prejudicial effect of the admission of this testimony even if relevant to, and admitted only for, the issue of malice, far outweighed its probative value. It should not have been allowed into evidence. The manner in which it was used, was not covered at pre-trial and under the circumstances, it should not have been allowed at trial. It definitely had an unwarranted detrimental effect on appellant's defense.

A new trial on the merits is necessary in this appeal. There are many interrelated allegations of error, all of which must be examined and can be disposed of by a new trial. The defendant is entitled to have the district court judgment amended to enter judgment for it on the 1965 slander court and to provide for a new trial in accordance with this opinion.[8]

ROSENN, Circuit Judge (concurring).

This is an appeal from a judgment for damages growing out of an incident at the Korvette Store at King of Prussia, Pennsylvania, on November 12, 1965. Pennsylvania substantive law applies since federal jurisdiction here is based upon diversity of citizenship.

Thomas, appellee and cross-appellant, was arrested on November 12, 1965, while employed by Korvette as its security chief at its King of Prussia store. At about 11:30 A.M. on that day he was observed by Brown, the assistant manager, taking a package out of the store and placing it in the trunk of his parked automobile. Brown immediately reported the incident to the store manager and, thereafter, procured Smith, an experienced security manager at one of its other stores, to investigate the incident. Following Smith's investigation, the local police were called, a complaint was filed, and Thomas was arrested. He was released by Magistrate Williams on bail for a later hearing. At the hearing, Magistrate Thomas heard testimony of the prosecution, after which he stated that the sum involved "isn't important enough to hold" defendant Thomas for court and dismissed the case upon payment of the costs of prosecution by the defendant.

Thomas later brought an action for false arrest, malicious prosecution, libel, and slander. The jury found in favor of Korvette on the libel count, and the trial judge instructed the jury not to award damages on the basis of a 1969 slander count. In a bifurcated trial, after first determining liability on the remaining counts, the jury returned a verdict for the appellee, Thomas, in the sum of $250,000 compensatory and $500,000 punitive damages. These were remitted except for $100,000 and $50,000 respectively.

On this appeal, Korvette raises a number of issues, namely, did the court err in:

(1) Submitting the question of probable cause to the jury;

---

8. In view of the reversal of the district court judgment, the cross-appeal at No. 71–2062 will be dismissed as moot.

(2) denying Korvette's motion for judgment n. o. v. on the false arrest and malicious prosecution counts;

(3) denying the motion for judgment n. o. v. on a 1965 slander count; and

(4) permitting introduction of evidence as to the 1969 slander.

Because society is concerned with balancing effective enforcement of the criminal law against protecting the individual from "unjustifiable and oppressive litigation of criminal charges," [1] courts have laid down rules to safeguard private persons who aid in the enforcement of the law against suits for malicious prosecution. In balancing these interests, the Pennsylvania Supreme Court apparently regards the interest of society in law enforcement as the more important. *See* Miller v. Pennsylvania R.R. Co., 371 Pa. 308, 310, 89 A.2d 809, (1952). Therefore, an action for malicious prosecution will not lie unless there has been a previous unsuccessful criminal proceeding that was prosecuted without probable cause and with malice. The plaintiff has the burden of proving each · element.[2] Want of probable cause is an indispensable element of the action. It is determined as of the date the prosecution was initiated and is in no sense dependent upon the guilt or innocence of the accused. Byers v. Ward,

368 Pa. 416, 421, 84 A.2d 307, 310 (1951). In Miller v. Pennsylvania R.R. Co., 371 Pa. 308, 314, 89 A.2d 809, 811–812 (1952), the Pennsylvania Supreme Court defined probable cause as "a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense."

## I. ALLOCATION OF FUNCTIONS BETWEEN JUDGE AND JURY.

The crucial question raised here is whether, in the trial of an action for malicious prosecution, the determination of the presence or lack of probable cause is for the court or the jury. The trial judge, in denying Korvette's motion for judgment n. o. v., held that the question was for the jury. He concluded that there were disputed factual issues with respect to probable cause, and that "it would have been error to declare that, as a matter of law, there was probable cause in this case." [3]

The trial judge submitted interrogatories to the jury in which he asked them to determine whether there was probable cause for the arrest of Thomas on November 12, 1965, and whether there was probable cause to press his prosecution on November 18, 1965, the date of the hearing.[4]

---

1. Restatement of Torts, chapter 29, introductory note at 380.

2. Simpson v. Montgomery Ward & Co., 354 Pa. 87, 46 A.2d 674 (1946); Miller v. Pennsylvania R.R. Co., 371 Pa. 308, 314, 89 A.2d 809, 811 (1952).

3. The trial judge, discussing in his opinion the disputed factual issues, stated:
 Plaintiff testified that the cashier corroborated his purchase of the toys, whereas the defense evidence was squarely contrary. The defendant's evidence was that it would be a clear violation of company regulations for the plaintiff to take merchandise out through the front doors of the store, even if it had been purchased; whereas the plaintiff testified that this was common practice, and that managerial employees were exempt from any such regulation. There was a dispute as to

whether the two packages were tied together when they were found in the trunk of plaintiff's car, and even as to the color of the string with which they were tied, and the significance of this circumstance. There were further issues with respect to the extent and reasonableness of defendant's investigation of the incident, the information supplied by the plaintiff and other employees, whether the circumstances of the production of the receipt at the Justice of the Peace hearing should have, or did, convince the defendant's employees of plaintiff's innocence, and many others.

4. The jury returned special verdicts as to probable cause and malice in response to the interrogatories as follows:
 1. Was there lack of probable cause for the arrest of the plaintiff on November 12, 1965? Yes.

The normal rule of law is that questions of fact are for the jury and questions of law are for the court. Because of societal concerns in protecting from intimidation citizens who aid public justice, however, and because of the difficulty for jurors of distinguishing between the issue of lack of probable cause and the issue of defendant's criminal guilt or innocence, variations in this principle of law have developed in malicious prosecution suits. In Curley v. Automobile Finance Co., 343 Pa. 280, 290, 23 A.2d 48, 53 (1941), the court noted that the general rule did not prevail in malicious prosecution cases, "for in such cases the trial judge and *not* the jury determines whether or not the prosecutor in the criminal case (i. e., the defendant in the civil action trying) had an honest belief in the existence of a probable cause for the prosecution's initiation." In Simpson v. Montgomery Ward & Co., 354 Pa. 87, 46 A.2d 674 (1946), the court had a further opportunity to review the question. It reversed a judgment in favor of plaintiff Simpson, concluding that the trial judge "committed a fundamental error when he submitted the basic existence or nonexistence of probable cause for the arrest of Mrs. Simpson to the jury." It stated:

> There is no principle more firmly embedded in the law than the principle that in case of malicious prosecution, the question of want of probable cause for the criminal prosecution which gave rise to the civil action, is a question *not for the jury but for the court.*[5]

*Simpson* appeared to approve the analysis in the Restatement of Torts that there are two possible courses of action for the trial judge in exercising his responsibility to decide probable cause in the event of controverted factual issues:

> The respective functions of the court and jury in determining the issue of probable cause can be exercised by them in one of two ways. The better but less usual method is to require the jury to find a special verdict setting forth the circumstances under which they find that the proceedings were initiated. Upon these findings the court then determines whether the defendant had probable cause. The usual method is for the court to charge the jury under what combination or combinations of circumstances, which may be found under the evidence, the defendant did or did not have probable cause for initiating the proceedings.

Restatement of Torts § 673, comment d at 437. In a later case, Miller v. Pennsylvania R. R. Co., 371 Pa. 308, 89 A.2d 809 (1952), the Pennsylvania Supreme Court adopted comment d. *See* Hugee v. Pennsylvania R. R. Co., 376 Pa. 286, 289, 101 A.2d 740, 742 (1954).

## II. FEDERAL OR STATE LAW.

With these precedents in mind, it is appropriate to discuss what law—state or federal—governs this issue. The problem of the relationship between state and federal law is a perennial one. The most significant Supreme Court proclamation for our purposes is Byrd v. Blue Ridge Electrical Cooperative, 356

---

2. Was there lack of probable cause to press the prosecution of the plaintiff on November 18, 1967? Yes.

3. In prosecuting the plaintiff, was the defendant motivated by malice? Yes.

5. 354 Pa. at 91, 46 A.2d at 676. The court, in explaining the basis for the deviation from the general rule in this type of case, stated:

> It has been immemorially held that the public interest requires that the legally trained mind of the judge and not the more or less emotional minds of jurors, decide whether or not there was probable cause for the initiation of the prosecution. Jurors are likely to confuse the issue of guilt or innocence of the defendant in the criminal case out of which the civil action originated with the basic issue whose determination decides the civil action. That basic issue is the want of probable cause for the criminal prosecution.

*Id.* at 92, 46 A.2d at 676.

U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). In that case, a workman brought an action to recover damages for personal injuries suffered in the course of his job constructing electric lines. His employer was hired to construct the lines for the defendant cooperative. The cooperative defended on the ground that the state workmen's compensation statute made its remedy exclusive against the cooperative as well as the plaintiff's immediate employer, because the work being done was part of the cooperative's trade, business or occupation." The established practice in the state courts was to have the question whether work was part of the defendant's "trade, business or occupation" decided by the judge, not the jury. The Court held that the federal courts should, instead of following state practice, employ a federal rule and let the jury decide this question. It reasoned:

> The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury. . . .

*Id.* at 537, 78 S.Ct. at 901. Moreover, it noted that "there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts." *Id.* at 538, 78 S.Ct. at 901. This policy should prevail unless the state rule is bound up with state-created rights and obligations or unless the policy is outweighed by the objective of preventing litigation from coming out one way in federal court and another way in state court. *Id.*

Applying these principles, I have concluded that the choice between the two methods detailed in Restatement of Torts § 673, comment d, of treating the probable cause issue is a procedural question which a federal court should resolve according to its policies and standards. Pennsylvania courts do not regard the particular allocation of functions between judge and jury as a matter bound up with the fundamental rights of the parties, but as a procedural matter. The procedural character, in their view, is illustrated by the options available to the trial judge. *See* Simpson v. Montgomery Ward & Co., 354 Pa. 87, 46 A.2d 674 (1946). The choice would not here affect the outcome in any predictable fashion. Moreover, this circuit has previously held that a rule attempting "to define when the jury must decide, as its function, whether the particular elements of liability exist" impinges on a field reserved for federal law. Gatenby v. Altoona Aviation Corp., 407 F.2d 443, 446 (3d Cir. 1968); *see* Lind v. Schenely Industries, Inc., 278 F.2d 79, 84 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). The resolution of this issue is one of the "details related to its own conduct of business" on which a federal court need not follow state law. *See* Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 555, 69 S.Ct. 1221, 1230, 93 L.Ed. 1528 (1949); *cf.* 1 J. Moore, Federal Practice ¶ 0.312 (2d ed. 1959).

Our next inquiry is whether federal policy should permit the trial judge to exercise the option of submitting disputed questions of fact in terms of the ultimate legal question as to the existence or nonexistence of probable cause to the jury or, rather, require that he follow the admittedly better rule? Under the better rule, the court would decide the legal question of probable cause based upon special findings of the jury as to any disputed questions of fact. In exercising our supervisory power over procedural rules this court should require the federal courts in this circuit to follow the latter course except, possibly, in the most unusual circumstances. This is compelled by several considerations: the great difficulty for the laymen on the jury in separating the question of guilt or innocence in the criminal proceeding from the question of probable

cause for the prosecution;[6] the complexity involved in instructing the jury as to the proper verdict based upon its choice among the many different possible combinations of factual findings; and the importance to society and the courts of encouraging citizens to aid in prosecuting violators of the law.[7]

Because the trial court submitted the basic issue of probable cause to the jury, I believe defendant is entitled to a new trial. In that trial, the court should instruct the jury to find only the facts. He should submit special interrogatories pertaining to the critical, disputed issues of fact.[8] He should not ask the jury any questions requiring legal conclu-sions, such as whether any of the individuals representing the defendant possessed a reasonable belief in the plaintiff's guilt.

### III. JUDGMENT N.O.V. ON FALSE ARREST AND MALICIOUS PROSECUTION.

Korvette argues that it is entitled to judgment n. o. v. on the actions for false arrest and malicious prosecution because, inter alia, Thomas failed to prove lack of probable cause for the prosecution and improper motive, and it enjoyed statutory immunity for the arrest. The trial judge was of the opinion that there was probable cause for Thomas' original

---

6. This difficulty is illustrated by the admission, in this case, of the testimony of Ward, who allegedly witnessed Thomas' payment for the games allegedly stolen. His testimony was only relevant to the ultimate issue of guilt or innocence. It was irrelevant to the issue of whether Korvette possessed a reasonable belief in Thomas' guilt. In a malicious prosecution or false arrest suit, the relevant inquiry is the reasonableness of the perceptions of the accusers. Therefore, the only relevant matter pertaining to Ward was what Thomas told Smith about him prior to the arrest. Apparently, the parties here did not realize this important distinction.

7. The growth and magnitude of shoplifting and employee theft in this country, and its enormous burden on society, is revealed in reports of several federal agencies. A study, by the Small Business Administration, of crime against small business, embodied in a report transmitted to the United States Senate Select Committee on Small Business, April 3, 1969, estimated the cost to small business of "ordinary crimes" at $1.4 billion for the year 1967, although the crimes under consideration were defined relatively narrowly. For 1970, this loss for ordinary crimes, including shoplifting and employee theft, was estimated at approximately $4.8 billion. Forty-one percent of this sum reflected losses in shoplifting and employee theft. A study by The Rand Corporation conducted for the Department of Justice, November, 1971, discloses that the cost of private crime prevention in 1969 exceeded $3.3 billion. *See* Preliminary Staff Report of Bureau of Domestic Commerce, U.S. Department of Commerce, The Economic Impact of

Crimes Against Business 9 (February 1972). This report of the U.S. Department of Commerce also observes:

> While shoplifting appears to be the most serious problem for retail establishments, most observers believe that because of the reluctance of businessmen to admit the magnitude of their employee theft problem, that figure is seriously understated. Some believe that employee theft accounts for substantially more loss than shoplifting by customers.
>
> . . . .
>
> Total inventory losses which result almost entirely from shoplifting and employee theft are estimated as high as four to five percent of sales at some stores. This is virtually equal to the normal profit margins in retailing.

*Id.* 9–11.

8. Restatement of Torts § 673, comment on clause (a) at 438, states:

> [A] jury has no function to perform with reference to the issue of probable cause unless there is a conflict in the testimony as to the circumstances under which the defendant acted in initiating the proceedings. If these circumstances are admitted by either party or if the evidence upon them is clear and uncontradicted there is no need for a finding of the jury to give the court information upon which to determine the existence or nonexistence of probable cause.

This is apparently now the law of Pennsylvania. *See* Hugee v. Pennsylvania R.R. Co., 376 Pa. 286, 289, 101 A.2d 740, 742 (1954) ; Miller v. Pennsylvania R.R. Co., 371 Pa. 308, 89 A.2d 809 (1952).

arrest but concluded that the question was for the jury.[9] We recognize that on this appeal the facts must be viewed in the light most favorable to Thomas.

Thomas acknowledged at trial the following basic facts: He had removed the Getaway Chase game from the Korvette store and placed it in the trunk of his car at about 11:30 A.M. without paying for it. When he opened the trunk of his car in the presence of Smith later in the day, after he allegedly made the payment, the two games were there and the register receipt could not be found. When he and Smith returned to the security office at the store, Smith at Thomas' request, pulled "the detail tape from the end register" and, in an effort to corroborate Thomas' claim of payment, "went over the detail tape looking for a total sale of $10.69" (the price of the two games plus tax). Smith said he could not find the amount on the tape and suggested that Thomas might have been mistaken as to the register at which the alleged payment was made, and that he might possibly have gone through one of the other two registers. Smith suggested pulling the detail tapes from the other two registers. Although Thomas insisted that he was not mistaken, Smith, nonetheless, went out and checked. Upon his return, about five minutes later, he reported that he was unable to find the appropriate amount on the tapes of the other two registers. Smith suggested that Thomas take a lie-detector test or polygraph examination. Thomas refused.

At the trial of this action, Thomas testified that when the cashier of the "end register" was called by Smith to the security office and questioned whether he had made a purchase at her booth she replied affirmatively. She was asked whether he purchased the two games found in his trunk and, at first, she said, "I think so." She then said, however, "I am not positive." Thomas acknowledged that the store rules laid down in the security manual for employees clearly prescribed that employee purchases were to be paid for and left at the sale department until they could be picked up and taken to the time clock area.[10]

Thus, by the time Smith called the police, the merchandise had been found in the trunk of Thomas' car, Thomas was unable to produce a receipt, none of the register tapes supported the alleged purchase, there was an apparent violation of written security regulations, and Thomas had refused to submit to a lie-detector test or polygraph examination. He also testified at trial that he refused to tell the police his version of the facts because "I had been advised by my attorney not to make a statement."[11] Un-

9. During the course of the trial, the trial judge indicated to counsel that he contemplated instructing the jury, or at least commenting strongly, that there was probable cause for the original arrest. In a colloquy with counsel a few minutes later, he stated:

[I]t seems to me rather clearly that there is probable cause for the original transaction. The only issue would be whether with the information at hand at the time of the justice of the peace hearing whether probable cause still existed at that point.

In short, as of the time, they didn't have any evidence of any purchase at all; I don't see how you can't say there wasn't probable cause, but that is a matter for the jury. I am going to let them pass on it.

10. Thomas contended that the rule was not applicable to him, the store manager, assistant store manager, or the floor manager. This asserted inapplicability, however, is irrelevant to the question of probable cause, since there was no evidence that either Smith or Brown, at the time of the arrest and prosecution, considered the regulations inapplicable.

11. The police report of this investigation, however, offered in evidence at trial by Thomas, discloses that he did give a statement, which varied substantially from his testimony at trial and differed from the statement of his counsel at the hearing before Justice of the Peace Thomas. The record reveals that defendant's representatives had such statement

der these circumstances, Brown finally signed a complaint in the evening. Magistrate Williams found that there was probable cause for the issuance of process. This proof without more would have failed to establish lack of probable cause and presence of improper purpose; on the contrary, it would have established probable cause as a matter of law.

The one constraining factor that prevents me from concluding that there was probable cause as a matter of law is the testimony given by Thomas on cross-examination that he had told Smith prior to the arrest that his friend Ward, a former security employee at the store, had witnessed his payment for the games. Thomas' testimony on this point is extremely suspect since he never mentioned Ward to the police on the evening of the alleged theft or at the preliminary hearing. Nevertheless, it was the jury's obligation to evaluate his credibility and to make the pertinent finding of fact. If the jury believed Thomas that he told Smith about Ward, in light of the apparent corroboration by the cashiers (equivocal as it was) of Thomas' claim to have purchased the games, then in these particular circumstances I believe that Pennsylvania law would place a burden on the store personnel to attempt to check with Ward prior to commencing a prosecution.

Korvette also contends that under Pennsylvania statutory law,[12] it was entitled to detain Thomas without liability for false arrest. Under this statute, any person willfully concealing unpurchased goods or merchandise of any store is prima facie presumed to have so concealed it with the intention of converting it to his own use. The statute further provides in part that:

> Persons so concealing such goods may be detained, in a reasonable manner and for a reasonable length of time, by a peace officer or a merchant or a merchant's employee in order that recovery of such goods may be effected. Such detention . . . shall not render such peace officer, merchant or merchant's employee, criminally or civilly, liable for false arrest, false imprisonment or unlawful detention.

18 Pa.Stat. § 4816.1. The apparent intent of this statute is to afford merchants some leeway in deciding whether to detain and prosecute someone they suspect of theft. Even under Thomas' version at trial, he was prima facie presumed to have concealed the first game with the intent to steal it at the time he removed it, since he admits he had not paid for it at that time. Our focus, however, must be on the time of detention and prosecution. At that time Thomas alleged the goods were purchased. He testified at trial that he told Smith that Ward would corroborate the payment. In view of this disputed testimony, I cannot say as a matter of law that the statutory presumption attaches. Pennsylvania could provide that a person may be detained whenever he cannot produce a receipt for goods allegedly purchased, but it has not.

The trial judge was of the opinion that a separate question for the jury was whether, "the production of the receipt at the Justice of the Peace hearing should have, or did, convince the defendant's employees of plaintiff's innocence." I believe that this should not have been

---

of plaintiff to the police available to them prior to the start of that hearing. They knew Thomas had been interrogated by the police. The police report reflects the presence at the police station of Korvette's representatives when the police investigating officer, Detective Sergeant Nasielski, arrived for the interrogation of Thomas. The latter's testimony discloses their continued presence after the interrogation.

12. 18 Pa.Stat. § 4816.1. When an amendment was enacted in 1959 to prohibit a

magistrate from reducing the offense from larceny to shoplifting as defined in the statute, the legislative history in the state House of Representatives reveals that the primary purpose of the statute "was to eliminate the enormous bulk of malicious prosecution [actions]. . . ." 1959 Pa. Legislative Journal, at 1798 (June 16, 1959) (statement by Mr. Ellberg, one of the sponsors of the bill in the House).

a separate inquiry and that, even if it were, the facts as to the existence of probable cause did not change materially.

The preliminary hearing on November 18, 1965, was not conducted by the issuing authority, Williams, but by Justice of the Peace Frank Thomas. At this hearing, Brown and Smith appeared and gave testimony and were subjected to searching cross-examination by counsel for Thomas. Thomas, however, *did not testify*. His counsel merely produced a cash register receipt that Thomas allegedly found on the day following his arrest in the trunk of his car, in the sum of $10.35, not $10.69, the price of the two games plus tax. The receipt that was produced indicated that it was issued on November 12, 1965, at about 4:15 P.M.[13] (Smith arrived at the store at 4:00 P.M. to conduct the investigation.)

In my opinion, the hearing, if anything, increased the reasonableness of Korvette's belief in Thomas' guilt. Thomas' trial version of the events was put into the record at this hearing. It conflicted with his earlier version contained in the police report. This conflicting version combined with the production of the alleged register receipt with its discrepancies and reflecting payment at about 4:15 P.M. could only have increased Korvette's suspicion. "[Probable cause] is not confined to the truth of the matters that lead to the prosecution, but extends to their *appear-*

*ance* as indicating the guilt or innocence of the accused." Bryant v. Kuntz, 25 Pa.Super. 102, 106 (1904) [Emphasis added]. Moreover, the question whether the receipt should have convinced Korvette of plaintiff's innocence is not relevant since Korvette took no action after the hearing and the magistrate decided to dismiss the case because of the sum involved.

Whether judgment n. o. v. should have been entered on the false arrest and malicious prosecution counts is an extremely close question in this case, but it appears that the court did not err since there was a crucial, disputed question of fact pertaining to the alleged communication to Smith of Ward's presence at the time of payment for the games.

## IV. THE SLANDERS.

### A. *The 1965 Slander*

Thomas also claimed that Korvette had slandered him several days after his arrest. To prove this cause of action, he called Mary Turner, an employee of Korvette. She testified that several days after the November 12 arrest, Smith asked her whether Thomas had purchased anything on the day of the arrest. She replied that she saw Thomas go through the end register but did not know what he purchased. She proceeded to testify over objection that:

He said the reason he was asking me is because Mr. Thomas had over a thousand dollars' worth of toys *or*

13. Brown estimated the time as 4:15 P.M. at the hearing, on the basis of the number of the sale and time the register tape was confiscated. (Although the transcript of such hearing was not included in the evidence submitted to the jury, the court ruled that it would be put into the record for consideration by it in making its rulings on the questions that were not to be submitted to the jury.) In his report to the police officer, Thomas stated that he had made the purchase of the two games at about 11:30 A.M. At trial, however, he testified that he paid for the two games at about 2:30 P.M.

At trial of the instant case, Thomas testified that he searched the trunk of

his car the day following the arrest, that he removed the spare tire and found the receipt, produced at the magistrate's hearing, "down inside the spare-tire wheel . . . with the stick tape attached." He neither notified Korvette of his find nor produced the alleged receipt for them, which might have led Korvette to drop the charges. He not only acknowledged that the receipt produced at the hearing "was in the wrong amount," but that he personally made no search of the trunk when he first opened it for Smith. The receipt admittedly bore discrepancies in the dollar amount of the purchase and in the number of items.

*something to that effect.* [Emphasis ours.]

The court submitted the slander claim to the jury on the basis of an allegation in paragraph 8 of the complaint charging Korvette with speaking and publishing false and defamatory words on November 12, 1965. The complaint does not state the defamatory words uttered and, as the trial judge noted in his opinion, "the plaintiff's pre-trial statement and the final pre-trial order were singularly uninstructive with respect to this incident." Despite these deficiencies, the court permitted this testimony to go to the jury because the incident was closely related to the main thrust of plaintiff's claim.

In my opinion, however, this testimony is insufficient to support an independent cause of action because of plaintiff's failure to carry his burden of proof on an essential element. 12 Pa. Stat. § 1584a(1)(d) specifically provides that the plaintiff in a defamation action has the burden of proving "[t]he recipient's understanding of [the communication's] defamatory meaning." *See* Harbridge v. Greyhound Lines, Inc., 294 F.Supp. 1059 (E.D.Pa.1969). This statute is a verbatim incorporation of Restatement of· Torts § 613(1)(d). The Restatement comment on this section explains that the plaintiff is relieved of this burden only if the communication is defamatory on its face. Restatement of Torts § 613, comment on subsection (1)

at 301. The alleged statement is not defamatory on its face. In its cryptic context, it cannot be said that the defamation is obvious. The statement is ambiguous and equivocal. It can be reasonably construed to refer to toys purchased or otherwise acquired by Thomas, although it is doubtful that this was the intention. Therefore, Thomas had the burden of proving that Mrs. Turner understood the words to be defamatory. He did not carry his burden. Moreover, Mrs. Turner was not certain of the exact words used—"they were something to that effect." She did not elaborate.[14]

The trial court, for these reasons, erred in refusing to direct a verdict of the defendant at the conclusion of the evidence and to enter judgment n. o. v. on this count.

### B. *The 1969 Slander*

Since this case must be retried, comment should be made with respect to the admissibility of testimony relating to an alleged 1969 slander. According to the evidence, Thomas applied for a job with the Miley Detective Agency in February 1969. Snyder, an employee of Miley, testified at trial that in checking Thomas' background he telephoned Korvette's King of Prussia store. After he informed the operator of what he wanted he was referred to a man who identified himself as the security manager. Snyder testified that the Korvette employee

---

14. Judgment n. o. v. might be justified on ·this ground alone on the basis of the rule that in actions for libel or slander, "the false and defamatory matter should be pleaded in *haec verba.*" Foltz v. Moore McCormack Lines, 189 F.2d 537, 539 (2d Cir.), cert. denied, 342 U.S. 871, 72 S.Ct. 106, 96 L.Ed. 655 (1951). The purpose of the rule, as stated in *Foltz*, is "to enable the court to decide the issues of whether the words as used apply to the plaintiff and tend to degrade him in the eyes of the community. . . ." Before words are deemed to be defamatory per se, the proof of what was uttered should also be unequivocal. Proof of the spoken word involves not only an accurate recollection of what

was said but accuracy in the auditor's perception (the physical sensation) of the word sounds. In addition, some words are frequently susceptible to variable meanings, depending upon the inflection, tone, and circumstance in which they were used. The danger of a misunderstanding is too great to permit equivocal proof in a case such as this. For example, consider the possibility that Smith spoke just one word differently than the statement attributed him in substance by the witness. No defamatory connotation would be possible if Smith in fact said, "Mr. Thomas purchased over a thousand dollars worth of toys."

asked him to wait and, after leaving the telephone for a few minutes, came back and said, "Well, if you want a thief working for you, go ahead and hire him." Snyder said he was then told that Thomas had been arrested for larceny by employee in November 1965 and that when he was arrested in 1965 he lied about his actions "and on that basis he could not be trusted, and he was fired the same day."

The trial court admitted this evidence and instructed the jury that it could be used to "shed light on the existence of malice or ill will relating back to the incident of November 1965." I think this was an abuse of discretion. This evidence was irrelevant on the question of malice. The individual who allegedly spoke these words was not identified and his authority to give character information about employees was not clearly established. Over three years had elapsed between the arrest and this telephone conversation. Moreover, there was no evidence to connect Smith or Brown, who initiated the 1965 arrest and prosecution, with the 1969 conversation. Finally, there was nothing to indicate that the speaker knew that the statements were untrue; nor was there anything to show that anyone at Korvette's responsible for the making or retaining of the records or anyone connected with the prosecution knew the statements to be false. Unless they were thought to be untrue they would not indicate malice—even on the part of the phantom speaker. The prejudicial effect of the admission of this evidence outweighed its very speculative probative value.

For the reasons stated in this opinion I would reverse the judgment of the district court and remand the case with directions to enter judgment n. o. v. on the 1965 slander count and to retry the false arrest and malicious prosecution counts in accordance with this opinion.

Judge Van Dusen concurs in this opinion, as well as in Judge McLaughlin's opinion, subject to the understanding that (a) the procedure de-scribed in Part II of this opinion as to the submission of special interrogatories to the jury shall govern at the new trial, and (b) the 1969 slander evidence was irrelevant on the issue of malice and should not have been admitted, as stated under IV–B of this opinion.