The AMERICAN BEARING
COMPANY, INC.

v.

LITTON INDUSTRIES, INC. and Litton
Industrial Products, Inc.

**Appeal of AMERICAN BEARING
COMPANY.**

No. 83–1248.

United States Court of Appeals,
Third Circuit.

Argued Nov. 14, 1983.

Decided March 16, 1984.

Rehearing and Rehearing In Banc
Denied April 16, 1984.

944

Samuel R. Simon, Philadelphia, Pa.; C. Gary Wynkoop (argued), Larry Haft, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellant.

Bruce W. Kauffman (argued), David H. Pittinsky, Lawrence D. Berger, Alexandra D. Sandler, Jonathan D. Natelson, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellees.

Before ADAMS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

Plaintiff, American Bearing Company, Inc. ("American"), appeals from the district court's order of May 26, 1982, denying the motion of defendant, Litton Industrial Products, Inc. ("Litton"), for a judgment notwithstanding the verdict but granting a new trial. Plaintiff commenced this action for product defamation, monopolization, and attempted monopolization, predicating its claims on the dissemination of an allegedly false Litton memorandum that evaluated an American product. A jury found Litton liable for monopolization and attempted monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1976), but not for product defamation. The jury awarded American $958,691., which amount the court trebled. *See* the Clayton Act, 15 U.S.C. § 15 (1976 & Supp. IV 1982). Ruling on Litton's post-trial motions, the court, pursuant to Fed.R.Civ.P. 50(b), set aside the jury verdict and ordered a new trial. *See American Bearing Co. v. Litton Industries, Inc.*, 540 F.Supp. 1163 (E.D.Pa.1982). At the end of the second trial, the district court granted defendant's motion for a directed verdict at the close of plaintiff's case on liability and entered judgment for defendant on March 9, 1983 (5794a). We affirm.[1]

---

1. Several other rulings of the district court are not presently before this court. First, plaintiff's complaint named Litton Industries, Inc., Litton's parent corporation, as a co-defendant. The district court granted the directed verdict motion of Litton Industries, Inc.; plaintiff does not challenge this judgment on appeal. Second, the jury's finding that Litton was not guilty of product defamation was not challenged. Third,

plaintiff originally challenged two allegedly erroneous evidentiary rulings made at the second trial. At oral argument, plaintiff waived these alleged errors and limited its appeal to the propriety of the district court's decision to grant a new trial (Transcript of Oral Argument filed November 30, 1983, at 2). Consequently, we do not review the rulings made at the second trial.

## I.

American, a New Jersey corporation, manufactures and sells, among other things, bearings for use in construction and industrial applications. Litton, a Delaware corporation, manufactures a wide variety of industrial products and equipment; its Merriman division manufactures and sells bearings for use in construction and industrial applications. Both companies manufacture a slide bearing used in electrostatic precipitators and baghouses, types of industrial air pollution control equipment.

Slide bearings are engineered items that are specified and fabricated on a job-by-job basis. They are manufactured in a variety of sizes from a variety of materials, including bronze, meehanite, steel, and Teflon, to meet the builders' specifications. Builders typically specify the parameters at which the bearings will be required to operate and manufacturers of bearings submit bids for those of their bearings that will meet the specifications. Specifications are normally stated in terms of temperature, pressure, and coefficients of friction.[2] Slide bearings are positioned at the structural support points of precipitators and baghouses to permit the structural supports to move freely in response to the expansion and contraction of steel columns.

Until 1975, American manufactured a slide bearing called the "Tetra-slide" bearing; the Tetra-slide bearing, however, could not meet the design specifications for precipitators and baghouses. At this time, Litton held patents on two structural support bearings, "Lubrite F" and "Lubritemp," which were used extensively in precipitators and baghouses.[3] American, realizing the potential profit in designing bearings for precipitators and baghouses, attempted to design a bearing that would meet the specifications of builders but would not infringe Litton's patents (247a–52a, 414a–15a). American developed such a bearing, designated it the "Hi-Load" bearing, and eventually patented it. American marketed its bearing as one appropriate for use in high temperature precipitator and baghouse structural support applications. As part of its marketing strategy, American distributed sales samples, measuring two inches by two inches, to potential purchasers in the air pollution control industry.

Litton learned in early 1976 that one of its slide bearing customers, the Carborundum Company ("Carborundum"), was considering the purchase of American's "Hi-Load" bearing (714–15a, 723–25a). The specifications for the Carborundum job required that the bearing be able to withstand 3000 pounds of pressure per square inch ("p.s.i.") and 400° F. temperature. Doubting that American's Hi-Load bearing was capable of meeting the specifications, Litton tested one of American's samples.[4] After conducting the test,[5] Litton drafted a memorandum that concluded: "Therefore

2. The coefficient of friction measures the bearing's resistance to sliding; it is expressed as a ratio between the horizontal force needed to initiate or maintain free lateral movement and the vertical force that the column exerts on the bearings. A bearing with a low coefficient of friction slides more easily than a bearing with a high coefficient of friction.

3. "Lubrite F" consisted of woven Teflon fiber affixed to a steel plate. Altering the plate could increase or decrease the coefficient of friction (1728a). The "Lubritemp" bearing is a non-metallic bearing which could withstand relatively high temperatures and high loads. Both bearings could satisfy a coefficient of friction requirement of 6% or 7% (1729a).

4. American argues that the samples were fabricated without quality control procedures and were too small to be actual bearings. Nevertheless, Litton invited Carborundum personnel to witness the test. Although they were unable to attend the test session, Carborundum officials "authorized" Litton to proceed with the test and "advise them of the results" (721a).

5. Because Litton's test apparatus required the sandwiching of a movable slide plate between two specimens and because Litton had only one bearing, Litton's engineering supervisor, Moy, obtained two specimens by cutting the lone sample in half. He placed one half above and one half below the moveable slide plate and tested the sample at Carborundum's specifications. American vigorously contends that cutting the sample in half destroyed the sample's structural integrity. Moy, however, satisfied himself that cutting the sample in half was not detrimental for testing purposes.

it is our opinion that this bearing cannot function at the specified load and temperature conditions" (2438a). During the next four years, Litton furnished copies of the memorandum to its salesmen without restricting its distribution. Litton, in fact, disseminated the memorandum to purchasing agents and engineers at several pollution equipment manufacturing companies (442–47a).

Finding itself unable to sell the "Hi-Load" bearing, American initiated this suit on June 15, 1978, alleging that the test memorandum was false and that Litton's publication of the memorandum constituted product defamation. Moreover, American asserted that Litton attempted to monopolize, and did monopolize, the market for slide bearings between 1976 and June 15, 1978, in violation of section 2 of the Sherman Act.

## II.

Trial commenced on May 19, 1981. American sought to establish its claims by presenting the testimony of four expert witnesses. American's first expert, J. Albert Hudson,[6] explained generally the structure and purposes of precipitators and baghouses. One of Hudson's most important contributions was his testimony that there is an average cost ratio of 0.003 or 0.3% between the cost of slide bearings installed in precipitators and baghouses and the costs of the precipitators and baghouses themselves.[7] American's second expert, Robert W. McIlvaine, testified to national sales statistics for precipitators and baghouses that utilize an inlet gas temperature of 250° or higher. He estimated that the aggregate dollar amount of precipitator and baghouse sales for the years 1976 to 1983 was $3,180,900,000.[8] (796a, 2465a).

Dr. Gary W. Bowman, an Associate Professor of Economics at Temple University, was American's final expert witness. He presented economic testimony to the jury, defined product and geographic markets, estimated the market shares of American and Litton, and estimated the damages American suffered from 1976 to 1983. Dr. Bowman defined "thermal" bearings as bearings which operate with a 3% coefficient of friction while exposed to temperature of 400° F. and pressure of 3000 p.s.i. (1263a, 1335a). He gave his opinion that a separate market exists for thermal bearings for use in the support structures of baghouses and precipitators and opined that the market was nationwide. Dr. Bowman was unable to ascertain directly American's damages. Instead, he attempted to calculate damages indirectly by utilizing the sales statistics presented by McIlvaine and the cost ratio presented by Hudson.[9]

6. Mr. Hudson, of Knoxville, Tennessee, was a former chief engineer at the Tennessee Valley Authority.

7. Consequently, a precipitator costing $1,000,-000. could be expected to incur bearing costs totaling $3,000. Hudson also testified that although actual operating temperatures of many baghouses and precipitators might be below 400° F., it was industry practice to use a bearing capable of operating at 400° F. with a low coefficient of friction to provide a margin of safety.

8. Mr. McIlvaine was president of The McIlvaine Co. He described The McIlvaine Co., located in Northbrook, Illinois, as "primarily an information center." The company performs individual client studies on the air pollution control industry; prepares multi-client market research reports; and publishes a "number of publications on the air pollution control industry" (780–81a). McIlvaine testified that his company "cull[ed] knowledge networks" to give individuals and companies technical information on how to select precipitators or baghouses and market information that indicated where new market opportunities might be found (782a). According to Mr. McIlvaine, six companies constructed 50% of the baghouses and precipitators built.

Professor Frederick Roll, of the Department of Civil Engineering at the University of Pennsylvania, was American's third expert witness. He explained relevant engineering concepts to the jury and testified that the Hi-Load bearings produced by American met the specifications of Carborundum (2503a).

9. No statistics for the annual dollar sales of slide bearings in the proffered market existed. Moreover, American made no effort to reconstruct the parties' respective market shares from Litton's records.

American completed the presentation of its case by presenting the testimony of three allegedly competing bearing manufacturers

Dr. Bowman determined the size of the total market for slide bearings simply by multiplying the sales statistics (2465a) by the cost ratio of 0.003 (2719a, 1266–67a). The multiplication process led Dr. Bowman to conclude that from 1976 to 1983 the aggregate sales for the nationwide market for slide bearings capable of operating at 3000 p.s.i., 400° F., with a 3% coefficient of friction, totaled $9,542,700. (2719a). Dr. Bowman offered an opinion as to the market share American would have captured absent the circulation of Litton's test report and estimated the amount of profits American lost as a result of Litton's test report. He concluded that American lost $1,611,279. as a result of Litton's memorandum and related activities (2719a).[10]

After three weeks of testimony, the jury returned a verdict in answer to special interrogatories. The jury found that Litton was not responsible for product defamation, but was liable both for monopolization and attempted monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1976); it assessed damages in the amount of $958,691. The district court, pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1976 & Supp. IV 1982), trebled the jury's award and entered judgment in favor of American in the amount of $2,876,-073.

Litton then filed a motion under Fed.R. Civ.P. 50(b) for judgment notwithstanding the verdict or, alternatively, for a new trial. In ruling on this motion, the district court held that it should have excluded Dr. Bowman's testimony under Fed.R.Evid. 403 and 703. The basis of this holding was that Dr. Bowman based his testimony on speculation and unsupported assumptions, and that Dr. Bowman calculated damages based on figures which included bearings

outside the market which he had defined for purposes of proving monopolization. The district court then ordered a new trial. The court declined to decide whether it would have been justified in granting a judgment n.o.v., deciding instead that a new trial was needed in any event to avoid a miscarriage of justice.

Pursuant to the court's new trial order, retrial commenced on February 28, 1983. At that trial, the district court made two evidentiary rulings that were adverse to plaintiff's case. Faced with the adverse evidentiary rulings, American presented an offer of proof of the testimony of one of its experts, withdrew the witness, moved its exhibits into evidence, and rested without proving a prima facie case. Defendants moved for a directed verdict, and the district court granted the motion. In its brief filed in this court, plaintiff challenged these two allegedly erroneous evidentiary rulings. At oral argument in this court, however, plaintiff waived its reliance on these allegedly erroneous rulings and limited its appeal to the propriety of the district court's decision to grant a new trial (Transcript of Oral Argument filed November 30, 1983, at 2). Our review, therefore, is limited to reviewing the propriety of the new trial order. If we affirm, the directed verdict plaintiff suffered at retrial will be unaffected. If, however, we should conclude that the district court abused its discretion by granting a new trial, we would remand for reinstatement of the jury verdict.

Because of the deficiencies in American's proof on the subjects of the relevant product market and causation in fact, we hold that the district court properly granted a new trial to prevent injustice and because

(1141a–1214a), and the deposition testimony of two bearing purchasers (870a–918a).

**10.** Litton offered evidence tending to show that baghouse and precipitator manufacturers did not routinely designate specifications of 400° F., 3000 p.s.i., and a 3% coefficient of friction when requesting bids for slide bearings for use in baghouses and precipitators. Litton's evidence showed that bearings other than Teflon-coated bearings were used in precipitators and bag-

houses and that bearing manufacturers other than Litton supplied bearings for some precipitators and baghouses. Moreover, Litton presented evidence that American's bids were rejected, on at least two occasions, either because American's bearings failed to meet specifications or because American failed to supply independently prepared test reports certifying its testing procedures and facilities.

the verdict was against the weight of the evidence. Since American has waived its objections to any errors in the second trial, we affirm the judgment for Litton.

## III.

To determine whether the district court properly granted a new trial under Fed.R. Civ.P. 50(b), we first must determine the appropriate legal standard for granting a new trial under that rule. Fed.R.Civ.P. 50(b) provides, in relevant part:

> "[A motion for] a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and *either* order a new trial *or* direct the entry of judgment as if the requested verdict had been directed." (Emphasis added.)

■■■ In this case, Litton made an alternative motion for a new trial. In such a circumstance, "the motion is tested by the same standards that would apply if the motion were independently made under rule 59." 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2539, at 608 (1971). A district court, therefore, may grant a new trial if required to prevent injustice or to correct a verdict that was against the weight of the evidence. *Thomas v. E.J. Korvette, Inc.,* 476 F.2d 471,

474–75 (3d Cir.1974); 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[5], at 59–140, 59–152 (2d ed. 1982). "The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court," *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980) (per curiam), and will only be disturbed if the district court abused that discretion.[11] We, therefore, review the district court's new trial order to determine whether the district court abused its discretion.

## IV.

As an antitrust plaintiff seeking treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), American must prove three elements: (1) an antitrust violation, in this case a violation of section 2 of the Sherman Act; (2) fact of damage or injury; and (3) measurable damages.[12] *Danny Kresky Enterprises Corp. v. Magid,* 716 F.2d 206, 207, 209 (3d Cir.1983); *Deaktor v. Fox Grocery Co.,* 475 F.2d 1112, 1116 (3d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). It is upon the first two elements, proof of a violation of section 2 of the Sherman Act and fact of injury, that this case turns.

## A.

■■■ To prove a violation of section 2, American must prove either monopolization

---

**11.** Plaintiff argues that the district court may only grant a new trial under Rule 50(b) when the moving party would be entitled to judgment notwithstanding the verdict. According to plaintiff, if the jury verdict is supported by enough evidence so that judgment n.o.v. would not be warranted, the district court would be powerless to grant a new trial under Rule 50(b). *See, e.g., Peterman v. Chicago, Rock Island & Pacific Railroad Co.,* 493 F.2d 88, 92 (8th Cir. 1974) (district court precluded from granting new trial under Rule 50(b) when it denies judgment n.o.v.). Plaintiff's reliance on *Peterman,* however, is misplaced. The rule announced in *Peterman* only applies when the verdict loser fails to move in the alternative for a new trial. *See* 9 C. Wright & A. Miller, *supra,* at § 2538 (if motion for judgment n.o.v. "must be denied, the court has no power to order a new trial in favor of the moving party ... unless a motion for a new trial has been joined in the alternative with the motion for judgment"). The district court's denial of the judgment n.o.v. motion, therefore,

is not relevant when the moving party makes the alternative new trial motion.

**12.** Section 4 provides, in part:

> "(a) Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee...."

15 U.S.C. § 15.

Section 2 of The Sherman Act, as amended, provides in part:

> "Every person who shall monopolize, or attempt to monopolize, ... shall be deemed guilty of a felony ...."

15 U.S.C. § 2.

or attempted monopolization. Both monopolization and attempted monopolization claims require American to present sufficient evidence to permit a jury to find that the defendant possessed the requisite market power necessary to constitute a monopoly. The market power analysis begins with a definition of the relevant product market for the particular product, *United States v. duPont & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), and is an element of a section 2 violation that plaintiff must establish to prevail. Without a definition of the relevant market, the defendant's ability to exclude competitors cannot be determined. *Walker, Inc. v. Food Machinery*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 117 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975). The outer boundaries of a product market are determined by the reasonable interchangeability of use between the product itself and substitutes for it. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *duPont & Co.*, 351 U.S. at 393, 76 S.Ct. at 1006.[13] Within a broad product market, submarkets, which constitute product markets for antitrust purposes, may exist. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1523. To establish that "thermal bearings" comprised a relevant product market or submarket, American, therefore, had to prove that a significant number of potential purchasers did not consider the bearings manufactured by American and Litton reasonably interchangeable with bearings produced by other bearing manufacturers. Evidence of "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" must be presented. *duPont & Co.*, 351 U.S. at 393, 395, 399–40, 76 S.Ct. at 1006, 1007, 1009; *Brown Shoe*, 370 U.S. at 327, 82 S.Ct. at 1525; *Edward J. Sweeney*, 637 F.2d at 117. American's evidence on this point was unpersuasive and failed to rebut Litton's evidence that many manufacturers were competitors in the market for bearings in baghouses and precipitators. Litton could not have had market power in the market established by its evidence, and a verdict predicated on the market American sought to prove would be against the weight of the evidence.

■ Instead, even at this stage in the litigation, the precise product market that American seeks to define is ambiguous. At trial and in its brief, American sought to establish that the relevant product market was a narrow one, limited to those slide bearings which operate at "400 degrees Fahrenheit, 3,000 pounds per square inch and 3 per cent coefficient of friction."[14] At oral argument, however, American as-

---

**13.** Although *Brown Shoe* was decided under § 7 of the Clayton Act, it has been readily applied in cases initiated under § 2 of the Sherman Act. *See, e.g., Columbia Metal, Etc. v. Kaiser Alum., Etc.*, 579 F.2d 20, 27 & n. 11 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

**14.** On p. 11 of its brief, American asserted that: "The relevant market in this case is the national market for slide bearings capable of operating at a coefficient of friction of 3% while exposed to temperature of 400° F and pressure of 3000 psi." Again, in its reply brief, American states that one of the company's owners testified as to the relevant product market. The owner, Mr. Furchak, testified that the manufacturers of high-temperature pollution control equipment require bearings that will function at a coefficient of friction of 3% or less while exposed to temperature of 400° F. and pressure of 3000 p.s.i. (250a–251a). Moreover, Dr. Bowman, the expert who, according to p. 7 of American's brief, "defined the relevant product and geographic markets," testified on direct examination:

"A [by Dr. Bowman] I was asked to analyze the area of thermal bearings to see whether or not, well, to analyze first to determine whether there is a market for thermal bearings.

Having determined that if this indeed was the case, to see whether or not they lost money because of certain activities of that market, to look at this market broadly, analyze the industry, a traditional study, and see what conclusions came out of that.

"Q Do you have an opinion Dr. Bowman, as to whether or not there is a market for thermal bearings?

serted that the relevant product market consists of those bearings used at the support points of all precipitators that operate above 250 degrees internal temperature" (Transcript of Oral Argument filed November 30, 1983, at 12–13). American's position apparently is that they should prevail and the jury's verdict reinstated if evidence could support a finding that either product market existed. We disagree. Instead, "we hold an antitrust plaintiff in an appeal to the theory advanced at trial." *Edward J. Sweeney,* 637 F.2d at 117. Accordingly, we review the evidence to determine whether American presented sufficient evidence to enable a jury to find that a submarket, consisting of slide bearings which operate at 400 degrees Fahrenheit, 3000 p.s.i., and 3% coefficient of friction, exists.

\* \* \* \* \* \*

[Dr. Bowman] Certainly. Thermal bearings are bearings which are slide bearings which operate at about 400 degrees Fahrenheit, 3000 pounds per square inch and 3 percent coefficient of friction."
(1262a–1264a, 1335a).

There is an extremely close question whether Dr. Bowman's testimony defining the relevant market is admissible. Dr. Bowman calculated the aggregate amount of bearing sales by multiplying the total sales figures of precipitators and baghouses provided by Mr. McIlvaine by the .3% cost ratio estimated by Mr. Hudson (2719a). Dr. Bowman, therefore, implicitly assumed that Litton and American were the sole suppliers of bearings to the entire baghouse and precipitator industry, an assumption for which there is no support in the record. *See* part IV–A *infra.* When he attempted to define a relevant market, however, Dr. Bowman opined that the market consisted only of those bearings capable of performing at 3000 p.s.i., 400° F., and 3% coefficient of friction. Finding that "there was no reliable or admissible evidence upon which the jury or the economist [Dr. Bowman] could determine the extent to which bearings outside of this market should have been deducted," and noting that the market which he defined for purposes of finding liability was inconsistent with the figures he used to calculate damages, the district court held that Dr. Bowman's testimony should have been excluded under Fed.R. Evid. 403 and 703.

The district court's reliance on Rule 703 has been called into question by this court's holding in *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983). Rule 403 gives the trial court broad discretion to weigh proffered testimony before determining whether the evidence should be excluded. In making

■ The only evidence on which the jury could have found that such a market existed was Dr. Bowman's testimony. As noted above, *see supra* note 14, Dr. Bowman's testimony was self-contradictory. On the other hand, the rest of the evidence strongly suggests that the bearings of both American and Litton competed in a far broader market. The coefficient of friction parameter best illustrates the problem. An examination of the specifications for thirteen jobs indicates that only two of the thirteen called for bearings capable of operating with a coefficient of friction of 3% (3800a). The coefficient of friction specifications, instead, cover a range from 3% to 15%, with the majority falling in the 6% to 10% range (3800a). One of American's experts, Dr. Roll, after examining specifica-

its determination, the court engages in a balancing process, "weighing the probative value of proffered evidence" against "the dangers and considerations enumerated in Rule 403." *United States v. Long,* 574 F.2d 761, 768 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978) (Adams, J., concurring). Courts have invoked Rule 403 to exclude expert testimony when its probative value is substantially outweighed by the possibility of misleading or confusing the jury. 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[04], at 403-38 to 403-42 (1983). *See, e.g., City of New York v. Pullman,* 662 F.2d 910, 915 (2d Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982) (evidence that has special aura of infallibility properly excluded under Rule 403); *Marx & Co. v. Diner's Club, Inc.,* 550 F.2d 505, 511 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977) (expert's dogmatic conclusion, though relevant, excludable under Rule 403).

In this case, the probative value of Dr. Bowman's testimony was minimal. As the district court correctly found, the speculation and unfounded assumptions underlying Dr. Bowman's testimony decreased its probative value, perhaps to the level of the gossamer. On the other hand, the inconsistencies between that part of Dr. Bowman's testimony that defined a relevant market and that addressing market share and damages increased the likelihood that his testimony would confuse and mislead the jury. A very strong case can hence be made for excluding Dr. Bowman's testimony under Fed.R.Evid. 403, and possibly under Rule 703, notwithstanding *Japanese Electronics.* We need not, however, reach the evidentiary issue in view of our disposition of the case. Accordingly, we will assume that Dr. Bowman's testimony was properly before the jury.

tions provided by American and specifications selected for his review by United Engineers, a large construction design company which designs precipitators, determined that the typical design specifications covered a broad range of temperature, pressure, and friction parameters. Roll concluded that:

> "The actual service load conditions depend upon the design specifications for the particular structure under consideration. Typical service load conditions for power plant requirements, for example, specify temperature of 350°F to 500°F, loads equivalent to bearing pressures of 2000 psi to 6000 psi, and bearing areas of approximately 5 ins. × 5 ins. to 8 ins. × 8 ins. Typical required coefficients of friction range from 3% to 15%, *with the majority in the 6% to 10% range.*" (Emphasis added.)

(2479a). Moreover, specifications from fifteen jobs on which American submitted bids between 1976 and 1979 demonstrate that a submarket consisting of 400° F., 3000 p.s.i., and 3% coefficient of friction did not exist. Instead, each job involved a potential sale to a manufacturer of precipitators or baghouses and each involved performance parameters different from 400° F., 3,000 p.s.i., and 3% coefficient of friction. Only two of the fifteen specifications required a coefficient of friction as low as 3%. In contrast, several of the specifications called for coefficients of friction of 10% or greater (Supp.App. at 101a, 103a, 110a). Because precipitator and baghouse specifications typically require bearings to operate at coefficients of friction higher than 3%, bronze and meehanite bearings, which cannot provide a 3% coefficient of friction but which can and do satisfy specifications for 10% and above, belong among competing products in the relevant market (583a, 588a, 2014a).[15] The tabulation of

slide bearing costs submitted by one precipitator design company, Belco Pollution Control Corporation, to Mr. Hudson demonstrates that meehanite competes with the Teflon bearings. Of eight precipitator jobs listed by Belco, four specify that the slide bearings used were not Teflon at all but meehanite (1337–38a, 1450a, 1452a). Moreover, American's president, Mr. Roman, admitted that the Cosmec Company manufactured bearings that routinely competed with those manufactured by Litton and American. Cosmec, a manufacturer of Teflon, bronze, and meehanite bearings, routinely bid for precipitator jobs calling for bronze and meehanite (604a–05a, 611a). Despite Mr. Roman's admission, American defined the relevant market to exclude bearings manufactured by Cosmec that routinely competed with bearings manufactured by Litton and American.

In addition, data supplied by American Air Filter, another precipitator design company, indicates that every single precipitator job included in its tabulation used Fluorogold slide bearings, a Teflon bearing manufactured by Fluorocarbon (194a). Wheelabrator-Frye, a major designer of precipitators and baghouses (3373a–74a), specified "self-lubricating slide bearing plates similar to or equal to type FC1010CS as manufactured by the Fluorocarbon Co." for use in its baghouses (3120a). Neither Fluorocarbon nor its products, however, appear in the narrowly defined submarket that American defined. Such relevant submarket, therefore, failed to account for a competitor whose Teflon slide bearings were used in every precipitator designed by one of the industry's major manufacturers and designated as the standard by a second manufacturer.

Even if Dr. Bowman's testimony was properly before the jury,[16] on this record, a

---

**15.** American argued at trial and on appeal that the "Hi-Load" bearing allows lighter support structure which gives "Hi-Load" bearings an extreme cost advantage. According to American, you can substitute these bearings for bronze and meehanite but cannot substitute bronze and meehanite bearings for Teflon bearings (Transcript of Oral Argument filed November 30,

1983, at 14–15). Nevertheless, "where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differed from others." *duPont & Co.,* 351 U.S. at 394, 76 S.Ct. at 1006–1007.

**16.** *See supra* note 14.

verdict predicated on a submarket for bearings capable of meeting the specifications of 400° F., 3000 p.s.i., and 3% coefficient of friction is clearly against the weight of the evidence and would constitute a seriously erroneous result. 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[5], at 59–147 (2d ed. 1983). A new trial was therefore necessary, and was certainly not an abuse of discretion.

### B.

■■■ A similar problem exists with respect to American's evidence establishing injury-in-fact. Even if it established an antitrust violation, to prevail American also must establish that the violation was a material cause of some injury to its business. *Zenith Radio Corp. v. Hazeltine,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *Rea v. Ford Motor Company,* 497 F.2d 577, 589 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). The evidence "linking the illegality and the injury must be more precise than that needed to establish the amount of damages." *Van Dyk Research,* 631 F.2d at 255; *Rea,* 497 F.2d at 589.

Unable to secure direct evidence of causation, American resorted to circumstantial evidence. American offers three instances of how dissemination of Litton's test memorandum allegedly caused injury to its business. First, the president of American, Dr. Roman, testified that shortly after developing the "Hi-Load" bearing he was well received by potential purchasers. After dissemination of Litton's memorandum, however, the reception turned "very, very cold" (405a). Second, American points to the fact that because bearings cost $130. each and that bearing failure could cost the companies approximately $200,000., a jury could reasonably infer that an engineer would not specify a bearing that a reliable source indicated would fail (Transcript of Oral Argument, filed November 30, 1983,

at 30–31). Third, American notes that it lost two specific jobs immediately after Litton circulated the test report, even though American's bids were substantially lower than Litton's (636–46a). American argues that the jury was entitled to infer from this circumstantial evidence that Litton's conduct was a material cause of American's injury.

■■■ In *Edward J. Sweeney,* 637 F.2d at 116, this court stated that "[i]nferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a *probability* that certain consequences can and *do* flow from the basic circumstantial facts .... [A]ssuming a causal connection between two events merely because one follows the other" is insufficient. *Id.* We believe that American's evidence on this point was sufficiently weak that a new trial could appropriately have been granted on this ground as well, because the jury's verdict on this point was against the weight of the evidence and constituted a miscarriage of justice.

American failed to offer any supportive evidence that the cool reception Dr. Roman received in the industry was attributable to dissemination of the Litton memorandum. Moreover, American did not produce any evidence to support its assertion that an engineer would not specify a bearing that a reliable source indicated would fail. Instead, there was substantial evidence to the contrary from potential customers who testified that their refusal to purchase American's Hi-Load bearing was for reasons unrelated to Litton's memorandum. Mr. Fred Clements, a structural engineer supervisor for a major manufacturer of precipitators and baghouses, Research-Cottrell, testified that American was not on its approved vendor list because American had not supplied sufficient engineering data and because Research-Cottrell had experienced trouble with a sheet Teflon bearing similar to the Hi-Load bearing in the past. Similarly, Mr. John Rupak, a purchasing agent for Wheelabrator-Frye, testified that it stopped soliciting bids from American be-

cause American failed to comply with Wheelabrator-Frye's standard certifying procedure. Wheelabrator-Frye required bearing manufacturers to submit neutral laboratory data certifying that the bearing would meet their required temperature and pressure conditions (912–17a). Finally, Mr. Robert Baker, manager of quality assurance and control at Combustion Engineering, another precipitator and baghouse manufacturer, testified that Combustion Engineering would not award any jobs to American until American provided sufficient information concerning the capabilities of its Hi-Load bearing, information American did not submit (2076–79a).

Finally, the record included substantial evidence that American, despite being the low bidder on two jobs for United Oil Products, lost the jobs to Litton for reasons unrelated to the Litton memorandum. Dr. Roman admitted that American's bid for one of the two jobs was late and for a bearing of the wrong size. Moreover, a letter introduced into evidence indicated that American believed these bids were lost because of an asserted conflict of interest between United Oil Products and another bearing manufacturer, the Allan P. James Company, not because of Litton's memorandum (453–56a, 1926–28a).

Although American did not have to present uncontroverted evidence to prevail, it did need to demonstrate a "probability that certain consequences can and do flow from the basic circumstantial facts." *Edward J. Sweeney*, 637 F.2d at 116. In light of the explanations offered by United Oil Products, and the limited evidence offered to substantiate American's allegations, we conclude that a new trial was proper on the ground that the jury's verdict, premised on the conclusion that Litton's memorandum caused American's damages, was against the weight of the evidence and would have resulted in a miscarriage of justice.

Accordingly, the March 9, 1983, judgment of the district court (5974a) will be affirmed.[17]

---

**17.** Because we determine that American failed to establish a relevant product market, we find it unnecessary to reach other issues covered in the district court's opinion or raised on this appeal. Our decision to affirm means that the district court properly granted a new trial at the conclusion of the first trial. In view of the directed verdict for the defendant at the second trial and plaintiff's waiver of alleged errors at that trial, American is not entitled to modification of the district court judgment of March 9, 1983.