Barbara **WHITTED**, Administratrix of the Estate of Stacy Whitted, and Barbara Whitted and John Whitted,

v.

**CITY OF PHILADELPHIA, et al.**

**Civ. A. No. 89–6386.**

United States District Court, E.D. Pennsylvania.

Aug. 2, 1990.

Andrew N. Rothseid, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiffs.

David A. Soltz, Deputy City Sol., City of Philadelphia, Law Dept., Philadelphia, Pa., for defendants.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

I.

The facts presented to the jury in this case may be summarized as follows. On the morning of June 22, 1989, Philadelphia Police Officers Alonzo Rush and Titus Knox responded to a radio call advising them that there was a "fight" at 53d and Warren Streets in Philadelphia. Once there, the two officers observed four males sitting in a late model Audi automobile across the street from the Shoemaker School, which was known to the officers, both experienced veterans, as an area in which drugs are widely distributed and violence is common. Approximately fifteen young people were gathered around the car. Rush recognized the driver of the Audi as Stacy Whitted, a nineteen-year-old Philadelphia resident, whom Rush believed from prior contact to be involved in the sale of narcotics. Upon leaving the scene, Whitted committed a traffic violation by backing the wrong way down Warren and driving at an excessive rate of speed.

Rush and Knox followed the Audi briefly. In response to the officers' radio inquiry, headquarters related that although there were "no wants" for the auto, the computer which stored information about stolen vehicles was down. The officers stopped the Audi. Knox approached the driver's side of the car while Rush went to the passenger's side. The officers asked Whitted to produce the automobile's registration and his operator's license. Whitted was unable to do so. Knox requested identification. Whitted replied that he did not have any.

Rush then searched the Audi's glove compartment. Knox demanded the car keys, which Whitted relinquished, and handed them to Rush. Rush opened the trunk and discovered several vials of what he thought (correctly, as later analysis demonstrated) was crack cocaine. Knox looked into the trunk, spotted the vials, and told Whitted to get out of the automobile. As Knox attempted to handcuff him, Whitted pushed Knox and fled.

Rush and Knox pursued Whitted on foot. After a short time, Knox returned to the police van and radioed headquarters for assistance. The dispatcher, in addition to relating the location of the pursuit and Whitted's physical description, broadcasted to other officers that Whitted was "wanted for investigation of [a] stolen vehicle." Knox, now driving the police van, observed Whitted run north into a narrow, rubble-filled alley between North Lindenwood and North Wilton Streets. Joined by Police Officer Donna Ferrell, Knox entered the alley and chased after Whitted on foot.

Sergeant Vincent Raducha, a twenty-year veteran of the police force who had been monitoring the pursuit on his radio, drove to the alley's entrance on Columbia Avenue in an attempt to cut off the suspect's escape route. When he exited his car the Sergeant did not take his baton. Heading south down the alley, Raducha saw Whitted approaching him. The Sergeant yelled for Whitted to stop. When Whitted spied Raducha, he turned, ran south briefly, and, apparently upon witnessing Knox and Ferrell coming from the opposite direction, turned again, and ran toward Raducha.

Raducha withdrew his service revolver and held it at his side. According to the Sergeant's testimony, because he had lost sight of the suspect's hands in the relatively dark alley, Raducha did not know whether Whitted had a weapon. Raducha again ordered Whitted to stop. Whitted complied this time, and Raducha placed Whitted against a wooden fence in a frisk position. The Sergeant put one hand on Whitted's back. Before he could reholster his firearm, Whitted elbowed Raducha in the face. The Sergeant, to keep from falling, grabbed Whitted's shoulder. Whitted punched Raducha twice and tried to pull away. Unsuccessful in his efforts to loosen Raducha's grip on him, Whitted grabbed the revolver with his right hand.

The two men struggled for the weapon momentarily. The Sergeant was attempting to push his firearm around Whitted's back when it discharged.

Other officers arrived and took Whitted to Osteopathic Hospital, where he was admitted at 9:50 a.m. Because the revolver was pointing upward at the time it discharged, the bullet, which entered near the mid-back, tore through Whitted's left lung and lodged in his neck. There was no evidence of trauma apart from the gunshot wound. After repeatedly suffering cardiac arrest, Whitted was pronounced dead at 11:30 a.m.

Barbara Whitted, as a parent of Stacy Whitted and as administrator of his estate, and John Whitted, the decedent's father, brought this action pursuant to 42 U.S.C. § 1983. In their complaint, they alleged that Rush and Knox violated Stacy Whitted's fourth amendment rights by illegally stopping the Audi and searching it. The plaintiffs claimed that Raducha, in violation of the fourth amendment and Pennsylvania negligence law, subjected the decedent to an unreasonable seizure of the person. Barbara and John Whitted further alleged that the City of Philadelphia and Police Commissioner Willie Williams, by inadequately training their law enforcement officials, were responsible for a policy or custom which led to their son's death.

At trial, because the uncontested evidence showed that the officers possessed a sufficient quantum of cause to stop the Audi, the Court granted a directed verdict in favor of Rush and Knox on that claim. The Court further ruled that the plaintiffs had failed to establish that the municipality or the Commissioner deliberately had pursued a policy of inadequate training that directly resulted in Whitted's death. The jury later concluded that the plaintiffs had not proven that the search conducted by Rush and Knox was without probable cause, but could not agree about whether Raducha's involvement in the shooting contravened the fourth amendment or state negligence law. The Court declared a mistrial on those counts.

The plaintiffs now move for a new trial. They assert that there was a triable issue as to municipal liability under section 1983 and that the Court consequently erred in granting the City's motion for a directed verdict. They also argue that the jury's verdict in favor of Rush and Knox is against the weight of the evidence and that the Court's reinstruction on probable cause was infirm. For the reasons that follow, the plaintiffs' motion must be denied.

## II.

■ The decision whether to grant a motion for a new trial on the ground that the verdict is contrary to the weight of the evidence is committed to the sound discretion of the trial court, which may set aside the verdict and submit the issues to another jury if it ascertains that the verdict constitutes a miscarriage of justice. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980); *American Bearing Co. v. Litton Indus.*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 474–75 (3d Cir. 1973). It is not sufficient that the court merely disagrees with the jury and would have reached a different decision on the merits. Rather, the evidence must preponderate heavily against the verdict. *Tibbs v. Florida*, 457 U.S. 31, 38 n. 11, 102 S.Ct. 2211, 2216 n. 11, 72 L.Ed.2d 652 (1982); *Grace v. Mauser–Werke GMBH*, 700 F.Supp. 1383, 1387–88 (E.D.Pa.1988); *Douglas W. Randall, Inc. v. AFA Protective Sys.*, 516 F.Supp. 1122, 1124 (E.D.Pa. 1981), *aff'd mem.*, 688 F.2d 820 (3d Cir. 1982). Of course, a new trial must be ordered if the movant demonstrates that the court prejudicially erred in its instructions to the jury or in its evidentiary rulings. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

■ The Court cannot agree that the jury's verdict in favor of Officers Knox and Rush was contrary to justice. Plainly, a law enforcement official who possesses probable cause for believing that a lawfully

stopped automobile contains contraband may conduct a warrantless search of it. *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *Chambers v. Maroney*, 399 U.S. 42, 48–51, 90 S.Ct. 1975, 1979–81, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69˙L.Ed. 543 (1925). Such a search may embrace "every part of the vehicle and its contents that may conceal the object of the search," *United States v. Ross*, 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982), including the vehicle's trunk, whether or not the officer "ha[s] independent reason to believe that the contraband for which [he or she is] searching is located specifically in the trunk." *United States v. Rickus*, 737 F.2d 360, 367 (3d Cir.1984). *Accord United States v. Schecter*, 717 F.2d 864, 869 (3d Cir.1983). Because the plaintiffs do not challenge the Court's prior ruling that the investigatory stop of the Audi was valid or assert that the scope of the search exceeded the boundaries established by the automobile exception to the fourth amendment's warrant requirement, the sole issue is whether the evidence adequately supports the jury's conclusion that the officers, on the basis of objective facts known to them at the time of the search, reasonably could have believed that there was a fair probability that Whitted's car contained drugs. *See generally Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Forrest*, 620 F.2d 446, 453 (5th Cir.1980).

All the evidence presented at trial militated toward the finding that they did. First, the officers testified that the vicinity surrounding the Shoemaker School is beleaguered by drug trafficking and violence. There is no question that "[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely" in ascertaining whether a suspect's automobile holds contraband. *See Rickus*, 737 F.2d at 365; *see also Carroll*, 267 U.S. at 160, 45 S.Ct. at 287; *United States v. Hatfield*, 815 F.2d 1068, 1072 (6th Cir.1987); *United States v. Magda*, 547 F.2d 756, 758 (2d Cir.1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d

157 (1977). Second, Officer Rush recognized Whitted as one he believed, from prior contact, to be involved in the drug trade. This species of personal knowledge also bears on the legitimacy of an officer's conclusion that illegal substances will be found in a vehicle. *See, e.g., Brinegar v. United States*, 338 U.S. 160, 166, 69 S.Ct. 1302, 1306, 93 L.Ed. 1879 (1949); *Carroll*, 267 U.S. at 160, 45 S.Ct. at 287; *Forrest*, 620 F.2d at 453–54; *United States v. Veatch*, 596 F.Supp. 1327, 1333 (W.D.Pa. 1984), *aff'd mem.*, 770 F.2d 1077 (3d Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 276, 88 L.Ed.2d 241 (1985). Third, a crowd of young people—an age group that unfortunately constitutes a sizeable market of drug consumers—were gathered around the Audi. These facts, taken together, reasonably alerted the officers that drug activity was transpiring and that, significantly, the locus of that activity was Whitted's car. Fourth, after the presence of the uniformed officers caused the group to disperse, Whitted immediately left the corner in a hurried and reckless manner, which evinced a consciousness of guilt. Last, upon questioning Whitted could not produce any identification or indicia of ownership of the Audi. The Third Circuit relied on precisely this factor in upholding the warrantless automobile search conducted in *Rickus*. 737 F.2d at 366.

The plaintiffs do not appear seriously to disagree that these circumstances give rise to probable cause. They insist, instead, that the underlying facts themselves do not have a "substantial basis," a requisite purportedly erected by *United States v. Schecter*, 717 F.2d at 869. Officers Knox and Rush did reveal, however, their reasons for believing the existence of all the underlying facts except one. They stated that they personally observed the events. The only fact susceptible to the plaintiffs' criticism is Rush's claim that he knew from previous experience that Whitted was a drug dealer, since he asserted his conclusion without greatly elaborating on the source of it. *See* Trans. of Tr., May 14, 1990, at 67, 81–82. Ironically enough, when the defendants' counsel inquired

about that subject during his examination of Rush, the plaintiffs objected. The Court also notes that the plaintiffs alleged in their complaint that Officer Rush had been harassing Whitted in the weeks before Whitted's death and questioned him about whether that was true. Presumably the plaintiffs had a basis for doing so.

■ In any event, the plaintiffs' reliance on *Schecter* does not yield the result they seek. In that decision the Third Circuit was referring to the long standing rule that in criminal cases the government's burden of proving probable cause necessarily entails a demonstration that the facts upon which an officer or magistrate relies are adequately supported. *See generally Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983); *Aguilar v. Texas,* 378 U.S. 108, 112–14, 84 S.Ct. 1509, 1512–14, 12 L.Ed.2d 723 (1964); *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958); *Nathanson v. United States,* 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933). This case, however, is a civil action in which the plaintiffs bear the risk of nonpersuasion. It is they who must establish that the auto search was unconstitutional because probable cause was lacking. *Crowder v. Sinyard,* 884 F.2d 804, 824–26 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990); *see also Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Edwards v. City of Philadelphia,* 860 F.2d 568, 571–73 (3d Cir.1988); *Hinshaw v. Doffer,* 785 F.2d 1260, 1266 (5th Cir.1986); *Wing v. Britton,* 748 F.2d 494, 497 (8th Cir.1984). To assume that an uncontroverted fact proffered to sustain a finding of probable cause is without a substantial basis unless the defendants show otherwise would essentially reassign the burden of proof in section 1983 actions predicated on claims of illegal search or arrest. *See Crowder,* 884 F.2d at 825–26; *cf. Martinez v. E.J. Korvette, Inc.,* 477 F.2d 1014, 1016 (3d Cir.1973) (Pennsylvania law). As such, if Officer Rush's articulated belief was without foundation, the plaintiffs were required to demonstrate that at trial.

■ Relatedly, the plaintiffs complain that the Court erred in reinstructing the jury. In response to the jury's request to clarify the charge on probable cause and to its question of whether a driver's license or registration is contraband, the Court stated initially that "contraband generally means something that is illegal." Trans. of Tr., May 18, 1990, at 5. The Court, after reading its charge on the illegal search count again, told the jury that contraband "is something illegal like drugs, like cocaine, like vials of cocaine[, or] it could be many other things that are illegal like guns that are not registered and things of that nature[. W]e didn't have that in this case but I am just trying to give you that to tell you what is contraband." *Id.* at 8.

The plaintiffs argue that the Court's statement was "prejudicial," "erroneous," and "misleading." Not only are these claims made without any explanation whatsoever, they were not made at trial and therefore have been waived. Fed.R.Civ.P. 51. The only asserted error preserved by the plaintiffs, *see* Trans. of Tr., May 18, 1990, at 18, was that the quoted portion of the reinstruction improperly suggested to the jury that probable cause to search existed solely because contraband ultimately was uncovered. The Court frankly does not understand by what curious logic an average person could formulate that conclusion. The definition and exemplars of contraband do not even remotely authorize the trier to bootstrap its probable cause determination on the officers' eventual discovery of drugs, and, at any rate, the Court charged the jury to the contrary. Immediately after delivering the portion of the reinstruction at issue, the Court went on to say:

> [T]he test for the existence of probable cause is whether, as judge by your common sense, your own common sense and your own practical knowledge[,] *at the time of the search* were the officers presented with circumstances and facts *within in their knowledge* that provided those police officers with a substantial basis on which they could have concluded that there was a fair probability that

they would find contraband in that vehicle that Stacy was driving on that morning.

*Id.* at 8–9 (emphasis added). Moreover, assuming that the jury impermissibly considered the fruits of the search in assessing its validity, the other circumstances surrounding the incident so strongly point toward the existence of probable cause that any error which occurred was harmless.

### III.

A basic principle of section 1983 jurisprudence is that supervisory liability for a deprivation of constitutional rights cannot be predicated solely upon the doctrine of respondeat superior. *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976); Comment, *Municipal Liability Under Section 1983: Rethinking the "Policy or Custom" Standard After* City of Oklahoma City v. Tuttle, 71 Iowa L.Rev. 1209, 1210–12 (1986). Rather, to secure a judgment against a municipality, a plaintiff must demonstrate that execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. *Monell v. Department of Social Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). "A governmental policy or custom may be established in two ways." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990). First, a policy is engendered when " 'a decision-maker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Id.* (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Second, a custom arises when a course of conduct by officials is "so permanent and well settled" that it has the force of law. *Monell,* 436 U.S. at 690, 98 S.Ct. at 2035 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)); *see also Jett v. Dallas Indep. Sch. Dist.,* —— U.S. ——, ——, 109 S.Ct. 2702, 2723,

105 L.Ed.2d 598 (1989); *Anela v. City of Wildwood,* 790 F.2d 1063, 1066–67 (3d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986). In either case, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews,* 895 F.2d at 1480. Before a municipality may be held to answer for the wrongs of its employees, there additionally must be proof of "a direct causal link" between the policy or custom and the alleged constitutional violation. *City of Canton v. Harris,* 489 U.S. 378, ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). *Accord City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion); *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Monell,* 436 U.S. at 683, 98 S.Ct. at 2032.

As necessary corollaries of the foregoing, a city's failure to adequately train its law enforcement officials in a particular respect is actionable under section 1983 only if that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact," *Harris,* 489 U.S. at ——, 109 S.Ct. at 1204; *see also Pembaur,* 475 U.S. at 483–84, 106 S.Ct. at 1300 (plurality opinion) ("[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives."); *Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 (plurality opinion), and if the identified deficiency in the training program is "closely related to the ultimate injury." *Harris,* 489 U.S. at ——, 109 S.Ct. at 1206. In resolving these questions, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at ——, 109 S.Ct. at 1205–06. The mere happening of the unconstitutional conduct or even proof that a particular officer was not properly trained will not, standing alone, suffice to affix liability onto a local governmental body. *Id.; Freedman v. City of Allentown,* 853 F.2d 1111, 1115–16 (3d Cir.1988). It may be, however, "in light of the duties assigned to

specific officers or employees," that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at ——, 109 S.Ct. at 1205.

In this case, the plaintiffs introduced the following evidence in their attempt to establish municipal liability. The Philadelphia Police Department, under the Commissioner's orders, has promulgated approximately 135 directives, which are written statements intended to guide the actions of officers in given circumstances. Directive 22 requires uniformed police officers, upon exiting their vehicles, to take their batons with them. Directive 10 states that an officer may employ deadly force to prevent the flight of certain felons or else "to prevent death or serious bodily injury to himself or to another person." The latter directive also provides that although officers "shall exhaust all other reasonable means of apprehension and control before resorting to the use of deadly force," they "shall not unnecessarily or unreasonably endanger themselves in applying these guidelines to actual situations." The department has no written policy specifically defining when an officer in the first instance may unholster his or her revolver.

Captain Frank Pryor, a supervisor of the individual defendant officers at the time of the shooting, testified that all persons hired as officers initially attend the department's Academy for a five month period. Once on duty, officers receive forty hours of updated and revised training at the Academy each year. In addition, during rollcall supervising officials regularly review the department's directives with the officers under their command. Both Captain Pryor and the Commissioner acknowledged that in practice officers do not always follow established directives, but that violations typically are minor ones, such as the failure to wear one's hat while on duty. They also noted that the directives are not designed to place officers in a straitjacket. Instead, an officer's response should be sensitive to the particular exigencies of a situation.

█ Throughout trial and in their arguments supporting their post-trial motion, the plaintiffs have advanced a number of theories, often inconsistent ones, to explain why a reasonable jury could find that the City and the Commissioner evinced a deliberate indifference to the citizenry's constitutional right to be free from unreasonable seizures of the person. Although the contentions they now advance are far from clear, their motion seems to rest, as the Court understands it, on two points. First, the department had no directive identifying the circumstances in which officers may withdraw their weapons from their holsters. Second, police supervisors were aware that officers deviated from existing directives, but failed to address the situation with more and better training. Citing *Harris*, 489 U.S. at —— n. 10, 109 S.Ct. at 1205 n. 10, the plaintiffs denominate the necessity for a directive constraining the unholstering of firearms and for the additional training of officers in the use of force, particularly deadly force, as "plainly obvious."

The first aspect of the plaintiffs' claim is at least twice wrong. True, as of June, 1989 the department had issued no specific directive to guide an officer's decision whether to unholster his or her service revolver. Directive 10, however, authorizes the use of deadly force to avoid death or serious injury, which was the justification Raducha gave for drawing his weapon. It necessarily follows that if Directive 10 authorized the employment of deadly force, it permitted the Sergeant to extract his revolver from his holster. The plaintiffs introduced not one scintilla of evidence to demonstrate that Philadelphia's training program inadequately equipped officers to identify when they or others are at risk of death or serious bodily injury, which plainly is a threshold requirement in this case. *See id.*, 489 U.S. at ——, 109 S.Ct. at 1205–06. Further, the Commissioner testified that of the some twenty major police departments which he contacted, none had guidelines otherwise delineating the time at

which a firearm may be drawn. Against that background, and in the absence of any proof that City policymakers were aware that officers in the field often abuse their partial discretion to unholster their weapons, no jury rationally could conclude that the municipal defendants were deliberately indifferent to the need for such a directive or for additional training in that regard, or indeed even that the circumscribed delegation of that judgment to officers was causally related to the injuries which Whitted suffered.

■ The second part of the plaintiffs' argument fares no better. Raducha's failure to take his baton when he exited the squad car was not an act fairly attributable to the City because it constituted departure from, not implementation of, department policy as enunciated by Directive 22. *See Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926. Nor was there the slightest modicum of proof that deviations from the edict were so common that Philadelphia's supervisory personnel could be said to be aware that training beyond mandatory refresher courses at the Academy and periodic review at rollcall was needed to ensure that officers in the field would comply with the policy.

The only evidence that arguably showed the requisite culpability on the part of the municipal defendants was testimony by the Commissioner and Captain Pryor that officers sometimes do not adhere to the directives. But these statements were of a most general kind and bore absolutely no relation to the deviations identified as the asserted causes of Stacy Whitted's death, namely, the Sergeant's failure to have his baton and his ostensibly unreasonable application of force by drawing a revolver to seize Whitted. *See* Trans. of Tr., May 14, 1990, at 59 (Testimony of Capt. Pryor) ("There [are] particular violations each day in our department and an officer, for example, he is supposed to wear his hat at all times. I'm sure you have seen, [and] I have seen, as a command officer, [that] officers do not [always] wear their hats."); *id.,* May 15, 1990, at 135 (Testimony of Comm'r Williams) ("I don't expect [offi-

cers] to follow each and every line of all 136 or 137 directives to the T, because it is probably not humanly possible at all times."). Their observations said nothing about whether officers so habitually disregarded the directives relevant to this case that the City's failure to address the alleged problem rose to the level of a conscious choice. That testimony, therefore, cannot support a reasonable inference that departure from Directives 10 and 22 was sufficiently frequent to constitute municipal custom or policy. *See Harris,* 489 U.S. at ——, 109 S.Ct. at 1205; *Anela,* 790 F.2d 1066–67.

Accordingly, the plaintiffs' motion for a new trial is denied.

## ORDER

AND NOW, this 2d day of August, 1990, for the reasons set forth in this Court's Memorandum of August 2, 1990;

IT IS ORDERED that Plaintiffs' Motion for New Trial is DENIED as to Plaintiffs' claim of illegal search, brought pursuant to 42 U.S.C. § 1983, against Defendant Officers Alonzo Rush and Titus Knox and as to Plaintiffs' claim of municipal liability, brought pursuant to 42 U.S.C. § 1983, against Defendants City of Philadelphia and Commissioner Willie Williams;

AND IT IS FURTHER ORDERED that, a mistrial previously having been declared, trial of the above-captioned action shall commence on October 8, 1990, at 9:30 a.m. in Courtroom 10B of the United States Courthouse, Philadelphia, as to Plaintiffs' claim of unreasonable force, brought pursuant to 42 U.S.C. § 1983, against Defendant Sergeant Vincent Raducha and as to Plaintiffs' claim of respondeat superior liability on the basis of Defendant Sergeant Raducha's conduct, brought pursuant to Pennsylvania state negligence law, against Defendant City of Philadelphia.